IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD E. JAMES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 18 C 4788 |
| v. ) | |
| ) | Hon. Virginia M. Kendall |
| GET FRESH PRODUCE, INC., PETER ) | |
| SIKORSKI, and MELISSA ANZONA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

*Pro se* Plaintiff Ronald James brings this suit alleging discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*, and 42 U.S.C. § 1981 ("Section 1981") against his current employer Defendant Get Fresh Produce, Inc. ("Get Fresh") and two Get Fresh employees—Defendants Peter Sikorski and Melissa Anzona. Specifically, this case revolves around the Defendants' failure to allow James to take vacation from work on two days of significance to him as a practicing Jehovah's Witness. As such, James alleges that Defendants failed to accommodate his practices and otherwise discriminated, harassed, and retaliated against him. *See* (Dkt. 1). Currently before the Court is Get Fresh's Motion to Dismiss. (Dkt. 10). For the reasons set forth below, the Motion is granted in part and denied in part. To the extent that James can cure the deficiencies explained below, he may file an amended complaint by December 20, 2018.

## BACKGROUND

James filed a 21-page Complaint and an 18-page Response Brief, both of which contain handwritten allegations with documents randomly interspersed throughout, sometimes without any apparent organization, making James's allegations and arguments difficult to comprehend. *See*

1

(Dkts. 1, 15). Construing James's *pro se* allegations liberally, *see Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017), and incorporating any facts consistent with the allegations in the Complaint as set forth in his response brief, *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) ("[F]acts alleged by a plaintiff in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint.") (quotation and citation omitted), the Court understands the relevant factual allegations to be as follows.

James began working at Get Fresh in 2007, and he is presently employed by the company as a Delivery Driver, delivering produce to restaurants and schools in Chicago. (Dkt. 1) at 12. Drivers are required to work six days per week; James has Sundays off. *Id.* at 16; (Dkt. 15) at 8. James is a Jehovah's Witness. He is also Black. As a Jehovah's Witness, every year James participates in religious meetings and conventions. He also participates in door to door ministry on a regular basis. (Dkt. 1) at 12. As relevant to this case, James is a union employee and Delivery Driver vacation requests are governed by a collective bargaining agreement ("CBA"),[1] under which drivers were permitted to request "two (2) consecutive weeks of vacation and five (5) individually scheduled days" prior to December 31 for the following year. *Id.* at 9.

On November 7, 2017, James filled out a vacation request form for 2018; he returned the form on November 8 to Anzona, a supervisor. *Id.* at 12–13; (Dkt. 15) at 6. He requested the following vacation days: July 2, 3, 6, 7; August 4, 11, 17, 25, 31; March 31; and September 1, 28, 29—in that order. (Dkt. 15) at 6–7. James received a response on November 15, 2017, which he alleges was from Anzona, approving his request for vacation on July 2–5 as well as on August 4, 11, 17, 25, and 31. *See* (Dkt. 1) at 9, 13. With regard to March 31, however, which James notes

---

[1] The CBA has not been provided to the Court, although it is referenced in some of the materials James submitted along with his Complaint and response brief.

2

is the "death of Christ" for Jehovah's Witnesses, he was told that he needed to "wait until the end of the bid process to request this date." If it was still available, James would be able to utilize a vacation day for this date. *Id.* at 9. The response notes that after December 31, requests for the year are on a first come, first serve basis.

James unsuccessfully attempted to get his union involved at this time. *Id.* at 14. So on his own, James attended a handful of meetings with various supervisors and managers (including Anzona and Sikorski, the Chief Financial Officer) regarding his requested vacation days; James felt intimidated at these meetings. (Dkt. 15) at 2. First, James alleges to have had a meeting with supervisors "Kevin and Megan" regarding the denial of the March 31 vacation day. (Dkt. 1) at 14. James alleges that Megan instructed him to "take another day off," to which he allegedly responded "its [sic] the death of Christ he died on that day" but "she did not care." *Id.*; *see also* (Dkt. 15) at 1. James attended "more meetings" but nothing changed. (Dkt. 1) at 15.

Presumably in the midst of the meetings, James submitted a Charge of Discrimination to the EEOC on December 7, 2017. In the Charge, he stated in total:

> I began my employment with Respondent on or about December 18, 2007. My current position is Delivery Driver. During my employment, I requested a religious accommodation and it was not provided. Subsequently, I am being subjected to harassment and different terms and conditions of employment, including, but not limited to, being denied when to take my vacation days and not being allowed to modify my work schedule in order to attend religious events.
>
> I believe I have been discriminated against because of my religion, Jehovah's Witness, my race, Black, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Dkt. 1) at 8 (Charge of Discrimination). Then, James was asked to work on "Sunday Dec[ember] 24 2017 so everyone can be off Dec[ember] 25 2017." *Id.* at 15; *see id.* at 19 ("In December 2017, the driver were told to work Sunday so the night driver can be off for Christmas on Monday."). James viewed this incident as discriminatory, alleging Get Fresh allowed the "night driver can

3

celebrate the Birth of Christ. But [Defendants] will not let [James] celebrate March 31, 2018 for the Death of Christ." *Id.* at 19. Since he typically has Sundays off, so he wrote a letter explaining that he goes to meetings and ministry on Sunday mornings. *Id.* At some point, possibly related to this same incident, Sikorski asked James to "write a letter" explaining what he does "on Sunday his day off," to which he responded that he "[goes] door to door in the morning. Then [he goes] to the Kingdom Hall to worship." *Id.* at 17.

Later, on February 28, 2018, James submitted a "Time Off Request Form" seeking to take vacation on June 29 and 30 so that he could attend a "religious meeting." *Id.* at 10. According to the form, on March 16, 2018, Anzona approved the June 29 request but denied the request for June 30 because "[t]his date has already been closed." *Id.*

In a letter dated March 9, 2018, Sikorski encouraged James to request additional days off—now outside of the vacation day bidding process prescribed by the CBA. *Id.* at 11; (Dkt. 15) at 10. In this letter, Sikorski informed James that March 31 was available: "We understand that March 31, 2018 is also an important day for you based on your religious practices. That day is still available and we urge you to act quickly to reserve it." (Dkt. 15) at 10. The letter also indicated that James's request for vacation on June 29 was approved; the request for a June 30 vacation day remained denied. *Id.* Apparently around this same time, Sikorksi also asked James to sign "a paper," which appears to have been a religious accommodation request form, to "try to intimidate him." *Id.* at 17–18. Sikorski did not ask other employees to sign accommodation forms; James did not sign the form. *Id.* at 17. Because of the lack of religious accommodation, James felt as if his religious beliefs were not respected. He also felt physically ill (he reported high blood pressure) and scared to go to work, because he feared that he would have to endure further intimidating meetings. *Id.* at 2.

4

In another letter, dated March 26, 2018, Sikorski wrote, "[a]s an additional accommodation to you, we will schedule March 31, 2018 as a day off for you" even though James failed to comply with the union-negotiated vacation-scheduling procedures. *Id.* at 12. The letter contains the following handwritten note: "March 31, 2018 Get Fresh call me at 4:30 am tell me to come to work." *Id.* Also on March 26, Sikorski appears to have approved James's request for a vacation day on June 30, commenting on James's February 28 Time Off Request Form that "both days now approved. Slot opened up due to change by driver reserving June 30." (Dkt. 1) at 10.

On April 18, 2018, the EEOC issued James a Dismissal and Notice of Rights. *Id.* at 7. James timely filed a Complaint in federal court, using the six-page "Complaint of Employment Discrimination" provided by the Northern District of Illinois. James checked the boxes stating the Defendants discriminated against him on account of his "Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981)" and "Religion (Title VII of the Civil Rights Act of 1964)." *See id.* at 4. As to how Defendants discriminated against him, James indicated that they "failed to reasonably accommodate the plaintiff's religion" and "failed to stop harassment"; James also handwrote that they "Retaliated; Accommodate Religious Days March 31 2018 and June 30 2018." *Id.* at 4–5.

Outside of these two specific time periods, March and June 2018, James generally complains that he was required to work on Saturdays and he claims that this is based on racial discrimination. James points to other Get Fresh employees—primarily Hispanic employees—who do not have to work on Saturdays and who at times are granted vacation days by Anzona without formally requesting them. *Id.* at 16; *see also* (Dkt. 15) at 4. Specifically, a Hispanic driver was allowed time off on a Friday, Saturday, and Sunday to play in a band. Another Hispanic driver has a schedule that allows him to attend school on the weekdays and work on the weekends. (Dkt.

5

15) at 4. James also alleges that Caucasian and Hispanic drivers get preferential treatment, such as better trucks, better routes, fewer deliveries. *Id.*

Finally, James alleges that as a result of the issues laid out in his Complaint, "they don't speak to me anymore. They look at me funny. Pick with me, trying to make problems" particularly with his FMLA days, which he needs for other reasons, although it is not entirely clear how. Also, "they told me I cannot miss day's [sic] for court." (Dkt. 15) at 4–5. As relief, James requests an order requiring Defendants to accommodate his religion, specifically by granting him days off for meetings and ministry. James also requests an order that his work days be confined to Monday through Friday; he wants Saturdays off for ministry. *Id.* Finally, James requests damages.

## **LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of Rule 12(b)(6) motion, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (quotation omitted). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). "Specific facts are unnecessary, but the complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court reads the complaint and assesses its plausibility as a whole. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir.

2011). In evaluating a *pro se* complaint, the Court applies a less stringent standard than it applies to formal pleadings drafted by lawyers. *Smith*, 803 F.3d at 309. But the Court need not ignore facts set forth in the complaint that undermine the plaintiff's claim, nor is the Court required to accept the plaintiff's legal conclusions. *Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 900 (N.D. Ill. 2016).

## DISCUSSION

Get Fresh moves to dismiss on two grounds, namely that James's claims of racial discrimination, harassment, and retaliation are insufficiently pled and that his claims were not properly exhausted. *See* (Dkt. 10). Accordingly, Get Fresh does not appear to challenge the substantive merits of James's religious-accommodation claim.

### I. Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). "[A] plaintiff alleging employment discrimination under Title VII may allege these claims quite generally." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "A complaint need not 'allege all, or any, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Id.* (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)).

Even after *Twombly* and *Iqbal*, it does not take much to state a claim for employment discrimination under Title VII. *E.g.*, *Tamayo*, 526 F.3d at 1084 ("[I]n order to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex.");

7

*see also Concentra Health Servs.*, 496 F.3d at 781 ("[A] plaintiff alleging employment discrimination on the basis of race, sex or some other factor governed by 42 U.S.C. § 2000e-2 may allege the defendant's intent quite generally: I was turned down for a job because of my race is all a complaint has to say.") (quotation and citation omitted); *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006) (holding that a religious discrimination plaintiff need only say that the employer "h[eld] the worker's religion against him")). "In these types of cases, the complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense." *Tamayo*, 526 F.3d at 1085; *see also Samovsky v. Nordstrom, Inc.*, 619 F. App'x 547, 548 (7th Cir. 2015). "Employers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014).

A.   **Exhaustion**

As an initial matter, before litigating an unlawful employment practice under Title VII, an employee must file a timely charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1); *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). This requirement "gives the employer some warning of the conduct about which the employee is aggrieved and affords the EEOC and the employer an opportunity to attempt conciliation without resort to the courts." *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005) (citation omitted). James has filed the necessary Charge, but Get Fresh first argues that James's allegations regarding the denial of vacation days on March 31 and June 30 were not included in the Charge specifically and therefore have not been properly exhausted. *See* (Dkt. 10) at 3.

"A plaintiff's failure to exhaust administrative remedies is an affirmative defense." *Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 921 (7th Cir. 2007); *see also Stuart v. Local 727, Int'l*

8

*Brotherhood of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014) ("A plaintiff is not required to negate an affirmative defense in his or her complaint[.]"). "Affirmative defenses cannot form the basis to dismiss unless the plaintiff's complaint pleads the plaintiff out of court." *Graham v. United Parcel Serv.*, 519 F. Supp. 2d 801, 808 (N.D. Ill. 2007) (citing *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718–19 (7th Cir. 1993)); *see also United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005) (claim may be dismissed as unexhausted at dismissal stage if "the allegations of the complaint . . . set forth everything necessary to satisfy the affirmative defense").

James's Charge generally alleges that he was denied a religious accommodation and "subsequently" subjected to harassment and different terms of employment, including further denials of vacation days for religious events. *See* (Dkt. 1) at 8. "The proper scope of a judicial proceeding following an EEOC charge 'is limited by the nature of the charges filed with the EEOC.'" *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 982 (N.D. Ill. 2014) (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)); *see also Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002). However, there is an exception to this rule for claims that are "reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999); *accord Moore v. Vital Prod., Inc.*, 641 F.3d 253, 256–57 (7th Cir. 2011) ("[I]f certain claims are not included in an EEOC charge, a plaintiff can still bring them if they are 'like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations.'") (citation omitted). To be "reasonably related," the EEOC charge and the relevant claim must involve the same conduct and implicate the same individuals. *Huri*, 804 F.3d at 832 (citing *Moore*, 641 F.3d at 257); *accord Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). If they are not related, "[e]ach incident of discrimination

and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice" within the meaning of the charge filing requirement of Title VII. *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 114 (2002).

The requests concerning March 31 and June 30 are properly within the scope of the Charge. First, there can be no real question as to whether the denial of the March 31 vacation day is encompassed by the Charge. The Charge was filed within one month of the initial denial for this day. The fact that the Charge does not specifically identify that date is not fatal. "Administrative charges of discrimination, whether filed with a state or federal agency, are to be construed liberally by federal courts to accommodate *pro se* filers and to further the remedial purposes of anti-discrimination statutes." *Ezell*, 400 F.3d at 1047; *see also Huri*, 804 F.3d at 831 (a Title VII plaintiff need not include in his charge every fact that, individually or in combination, forms the basis of a subsequent lawsuit's claims). As to the June 30 vacation day, even though the Complaint, Response Brief, and associated documents indicate that the Charge was filed some two or three months before James even initiated the request for this day off, it appears to be reasonably related to the initial failure to accommodate that served as the basis of the Charge because it involves the same conduct (denial of a request for a day off for religious reasons) by the same individuals (specifically Sikorski and Anzona). *See Huri*, 804 F.3d at 831–32. Further, a document James submitted in connection with his response brief, which appears to be the second page of a submission by Get Fresh to the EEOC employee Sergio Maldonado, discusses James's request for the June 30 vacation day. *See* (Dkt. 15) at 8. As such, the documents submitted indicate that the June 30 request was included in the investigation of the Charge. *See Green*, 197 F.3d at 898. The administrative remedies for James's claims regarding the accommodation requests for March 31 and June 30 have been exhausted.

However, the Court's review of the Charge indicates that James's claim of racial discrimination on account of general differential treatment (and unrelated to his specific vacation day requests)—that is, that two Hispanic drivers have schedules where they do not have to work six full days per week, that Caucasian drivers generally can get Saturdays off without making a formal request, and that Caucasian and/or Hispanic drivers get better trucks, better routes, and fewer deliveries—is not contained within the scope of the Charge or reasonably related to those claims within the Charge. *See Peters*, 307 F.3d at 550 (affirming dismissal of retaliation claim that was not like or reasonably related to the discrimination claims in plaintiff's EEOC charge). Thus, to the extent that this particular claim is brought under Title VII, James has failed to exhaust his administrative remedies and it is dismissed without prejudice.

### B. Race Discrimination Under Title VII

To the extent that James's Complaint alleges that his vacation requests for March 31 and June 30 were denied on account of his race, although this claim appears to have been included in his Charge of Discrimination and therefore has been properly exhausted, Get Fresh argues that the claim should be dismissed as insufficiently pled. (Dkt. 10) at 2. Get Fresh is correct. In particular, with respect to the March and June vacation day issues James experienced, his Complaint lacks any allegations tying such issues to his race. Again, the discriminatory actions selected in the Complaint are that Get Fresh failed to accommodate James's religion, failed to stop harassment, and retaliated against him. (Dkt. 1) at 4. That is, the Complaint and Response, as well as the EEOC Charge, indicate that all three events revolve around religion, as the harassment and retaliation only occurred "subsequent" to James's request for a religious accommodation. In addition, the Complaint and response lack allegations that Get Fresh allowed non-Black employees to take vacation days for religious reasons or that the vacation day policy was otherwise applied

11

in a racially discriminatory fashion. To be sure, the Complaint and Response discuss the "night driver" who was given a Sunday off to celebrate Christmas in 2017, but both the Complaint and Response are silent as to the night driver's race. After careful review of the Complaint and Response, the relevance of James's race to his Title VII discrimination claim is less than apparent. Instead, the entire focus of this claim appears to be on the denial of a religious accommodation, namely two days off for a holiday and religious meeting. Further, this does not appear to be such a case where James's religion and race are so intertwined as to be indistinguishable and to therefore "unlock the doors of discovery on allegations of race . . . discrimination." *Badal v. Ariens Co.*, 2018 WL 3037401, at *5 (E.D. Wis. June 19, 2018) (dismissing claims of race and national origin discrimination where American Black Muslims of Somali national origin brought suit after prayer-break accommodation was revoked; case did not involve plausible allegations that it was more than just a dispute over the religious accommodation). Accordingly, to the extent that the Complaint contains a claim for racial discrimination under Title VII regarding the denial of the two vacation days, that claim is dismissed without prejudice.

    C.    **Hostile Work Environment**

A hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). To state a Title VII hostile work environment claim, James must allege "(i) that [his] work environment was objectively and subjectively offensive; (ii) that the harassment was based on [his] race; (iii) that the harassment was pervasive or severe; and (iv) that a legal basis exists for holding [Defendants] liable." *Cable v. FCA US LLC*, 679 F. App'x 473, 476 (7th Cir. 2017); *see also Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 & n.6 (7th Cir. 2016) (same). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or persuasive to alter the conditions

of employment such that it creates an *abusive* relationship." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir.2009) (emphasis in original). In order to demonstrate harassment "that rises to the level of a statutory violation, the plaintiff must prove that his or her work environment was both subjectively and objectively offensive; one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 947 (7th Cir. 2005) (internal quotation marks omitted); *see also Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) ("Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (internal quotation marks omitted). In determining whether a workplace is objectively hostile, courts consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alamo*, 864 F.3d at 549–50.

The conduct alleged in the Complaint "fall[s] short of the kind of conduct that might support a hostile work environment claim." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011). James alleges that following the denial of his requested vacation days, he had to attend numerous meetings with supervisors, which left him feeling sick, scared, and stressed with high blood pressure. *See* (Dkt. 15) at 2–3. There are some allegations that the supervisors at the meetings got angry with James or acted like they did not care about his religious practices, but the letters presented to James at the meetings, some of which are included in the Complaint and Response Brief, reflect Defendants' efforts to address the issue of his vacation day requests comprehensively. While there is no doubt that the meetings had a negative effect on James

13

personally, standing alone, these meetings as described in the allegations and attachments do not constitute harassment so severe or pervasive to alter the conditions of his employment and create an abusive working environment for Title VII purposes. The hostile work environment claim, accordingly, is dismissed without prejudice.

### D. Retaliation

Next, to state a claim for retaliation, James must allege that: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005); *see also Huri*, 804 F.3d at 833 ("To plead a Title VII retaliation claim, a plaintiff must (though []he need not use the specific terms) allege that []he engaged in statutorily protected activity and was subjected to adverse employment action as a result of that activity."). Although James has alleged that he engaged in protected activity either by way of his requests for religious accommodation or by filing his Charge of Discrimination, he has failed to sufficiently allege that suffered an adverse employment action on account of his protected actions.

An adverse employment action in the retaliation context is an action that would dissuade a reasonable worker from participating in protected activity. *See Huri*, 804 F.3d at 833 (citing *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014)). Here, James alleges that Defendants retaliated against him in the following ways: "They don't speak to me anymore. They look at me funny. Pick with me, trying to make problems," "trying to make problems with my FMLA days" and "they told me I cannot miss day's [sic] for court." (Dkt. 15) at 4–5. But these allegations are simply too general to support a retaliation claim. First of all, it is not clear who is not speaking to James or looking at him funny, and further, it is not clear what is happening to his FMLA requests or allotment, if anything. Although James may see a connection between these acts and his

14

accommodation requests or the filing of his EEOC Charge, the allegations fail to sufficiently allege any connection and, other than the silent treatment and funny looks from some, who may or may not know about the religious accommodation requests or Charge, the allegations do not indicate with adequate detail the "problems" that some are making (or trying to make) for James. Although the Title VII pleading standard is an "undemanding" one, *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015), James's allegations simply do not rise to this level. Without more, his allegations do not demonstrate employer action that would dissuade a reasonable worker from engaging in protected activity. *See Huri*, 804 F.3d at 833–34.

### E. The Individual Defendants

As a final point, Get Fresh tersely argues that James should be "directed to state [his religious discrimination claims] against the corporation only." (Dkt. 10) at 1 n.1, 3. Get Fresh is correct that "there is no individual liability under Title VII." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017); *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also Aku v. Chicago Bd. of Ed.*, 290 F. Supp. 3d 852, 860 (N.D. Ill. 2017) ("Seventh Circuit law is clear that . . . Title VII do[es] not provide for individual liability."). Therefore, James's Title VII claims against Anzona and Sikorski are dismissed. If James files an amended complaint, Get Fresh should be named as the only Defendant on any Title VII claims asserted.

## II. Section 1981 Claim

Finally, the Court analyzes James's claims of racial discrimination to the extent they are brought under Section 1981 since the form Complaint also cites to that statute. *See* (Dkt. 1) at 4. "Section 1981 prohibits discrimination in the making and enforcement of private contracts." *Black Agents & Brokers Agency, Inc. v. Near N. Ins. Brokerage*, 409 F.3d 833, 837 (7th Cir. 2005). In

15

order to plead a plausible Section 1981 claim of racial discrimination, one must plead facts that support (1) he is a member of a racial minority; (2) the defendant had the intent to discriminate on the basis of the plaintiff's race; and (3) the discrimination concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). Employment suffices as a contractual relationship under Section 1981. It bears noting for purposes of this analysis that, unlike James's Title VII claims, his Section 1981 claims do not require administrative exhaustion (so the allegations of differential treatment when it comes to schedules, trucks, routes, etc. may be considered), *see Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 530 (7th Cir. 2003), and Section 1981 claims may be brought against individual defendants who participated in the unlawful conduct. *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015); *see Carlson*, 758 F.3d at 827 (to state a Section 1981 claim against the individual defendants, a plaintiff must allege that they "instituted a (specified) adverse employment action against [him]" on the basis of his race) (internal quotation marks omitted).

Despite these differences, the substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981. *Smith*, 681 F.3d at 896; *see also Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015) (the analysis for discrimination claims under Title VII is identical to the analysis for discrimination claims under Section 1981). Therefore, under Section 1981, a plaintiff alleging employment discrimination must plausibly allege in his complaint that he was subjected to intentional discrimination based upon his race; these allegations can be made quite generally. *See Tamayo*, 526 F.3d at 1081.

An essential element of a discrimination claim is an adverse employment action. *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018). An adverse employment action is a

"materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (alteration in original) (citation omitted); *see Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (a materially adverse change "is one which visits upon a plaintiff a significant change in employment status") (citing *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)); *accord Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008). Put differently, an adverse employment action is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Madlock*, 885 F.3d at 470 (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010) ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace.") (citation and internal quotation marks omitted). Adverse employment actions typically fall into one of three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454–454 (7th Cir. 2011).

Here, James has pled at least two Hispanic drivers have more ideal or flexible schedules (that is, they do not have to work the required six days per week), that Caucasian drivers get the best trucks and better routes, that Anzona gives Caucasian drivers Saturdays off without formal requests. *See* (Dkt. 15) at 4. But these allegations are not adequate to allege that James has suffered an adverse employment action on account of his race. Regarding his schedule, if James had alleged that he *lost* vacation days because of his race, he would presumably fall within the first category of adverse employment actions as a reduction in benefits. But the allegations and attached materials indicate that James did not *lose* any earned or awarded vacation days; instead, he was not initially granted approval to take vacation on two days that he requested. Further, it is not apparent how the allegations that other drivers have different scheduling arrangements to work fewer than six days per week support an inference that James has experienced some sort of materially adverse change in his own employment status, especially in the absence of any indication that James requested a similar schedule modification.

In addition, the Court considers James's allegations that certain Hispanic and Caucasian drivers are treated better or more favorably, but these too do not lead to an inference that James has suffered a materially adverse change in the terms of conditions of his employment status. It is not that these actions cannot support a claim for race discrimination, but as currently alleged— lacking specifics and lacking any allegations as to how such actions had an effect on James's employment relationship with Defendants—they do not sufficiently allege an adverse employment action in and of themselves. Thus, the Complaint fails to state a claim for Section 1981 discrimination. *See, e.g., Peters v. Wal-Mart*, 876 F. Supp. 2d 1025, 1035 (N.D. Ind. 2012), *aff'd* 512 F. App'x 622 (7th Cir. 2013) (allegations that defendants would not allow plaintiff to modify her schedule, reprimanded her rudely, failed to train her on certain equipment, required her to take

a drug test, kept her under "close surveillance," gave her a written coaching, and gave her difficult work assignments were insufficient to establish an adverse employment action as a matter of law). This claim, too, is dismissed without prejudice.

## CONCLUSION

For the reasons explained above, the Court grants in part and denies in part Get Fresh's Motion to Dismiss. (Dkt. 10). Specifically, the Motion is denied with respect to the religious-accommodation claim. However, the Motion is granted with respect to James's claims of race discrimination, harassment, and retaliation under Title VII and his Section 1981 claim. Those claims are dismissed without prejudice. To the extent James can cure the deficiencies highlighted above, he shall have until December 20, 2018 to amend his complaint consistent with this opinion.

 _____
 Hon. Virginia M. Kendall
 United States District Judge

Date: November 28, 2018